# AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT ☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud

Counts Two and Three: 18 U.S.C. § 1343 – Wire Fraud

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

**PENALTY:**
Maximum Prison Term: 20 years
Maximum Term of Supervised Release: 3 years
Fine: $250,000
Forfeiture

### DEFENDANT - U.S

Antoine Tsao, a/k/a Chung Tien Tsao,

**DISTRICT COURT NUMBER**

CR25-00082 AMO

### PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: Patrick D. Robbins
☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Benjamin K. Kleinman

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges

2) ☐
3) ☐

**IS IN CUSTODY**
4) ☐
5) ☐
6) ☐

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No
If "Yes" give date filed

**DATE OF ARREST** Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** Month/Day/Year

☐ This report amends AO 257 previously submitted

**FILED**
Mar 25 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT   Bail Amount: No bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:   Before Judge:

Comments:

AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT  ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

## OFFENSE CHARGED

Count One: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud

Counts Two and Three: 18 U.S.C. § 1343 – Wire Fraud

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Maximum Prison Term: 20 years
Maximum Term of Supervised Release: 3 years
Fine: $250,000
Forfeiture

### DEFENDANT - U.S

Ian Sofronov

DISTRICT COURT NUMBER

CR25-00082 AMO

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: Patrick D. Robbins

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Benjamin K. Kleinman

## DEFENDANT

IS *NOT* IN CUSTODY
1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐
3) ☐

IS

4) ☐
5) ☐
6) ☐

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes  ☐ No  If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

**FILED**

Mar 25 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT     Bail Amount: No bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:     Before Judge:

Comments:

AO 257 (Rev. 6/78)

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT  ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

## OFFENSE CHARGED

Count One: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud

Counts Two and Three: 18 U.S.C. § 1343 – Wire Fraud

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Maximum Prison Term: 20 years
Maximum Term of Supervised Release: 3 years
Fine: $250,000
Forfeiture

### DEFENDANT - U.S
Nemanja Popov

DISTRICT COURT NUMBER
CR25-00082 AMO

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: Patrick D. Robbins
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Benjamin K. Kleinman

## DEFENDANT

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

FILED
Mar 25 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount: No bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:   Before Judge:

Comments:

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: OAKLAND

CR25-00082 AMO

UNITED STATES OF AMERICA,

V.

ANTOINE TSAO, a/k/a Chung Tien Tsao,
IAN SOFRONOV, and
NEMANJA POPOV,

DEFENDANT(S).

**FILED**

Mar 25 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture Allegations

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 25th day of

March, 2025.

/s/ Sallie Kim
Brenda Lopez, Deputy Clerk

Bail, $ Warrants (3)

Hon. Sallie Kim, U.S. Magistrate Judge

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

FILED

Mar 25 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTOINE TSAO, a/k/a Chung Tien Tsao, IAN SOFRONOV, and NEMANJA POPOV,<br><br>Defendants. | CASE NO. CR25-00082 AMO<br><br><u>VIOLATIONS</u>:<br>18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;<br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture Allegations<br><br>**OAKLAND VENUE**<br><br>**UNDER SEAL** |

I N D I C T M E N T

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

1. GOTBIT CONSULTING LLC ("GOTBIT"), also known as GotBit Hedge Fund, was a company registered in Belize. GOTBIT operated both inside and outside the United States. GOTBIT had a public website ("https://gotbit.io/") on which it purported to offer "market making" services for cryptocurrencies, such as active monitoring of cryptocurrency trading and price fluctuations, trading in cryptocurrencies to capitalize on price fluctuations, and related consulting services. GOTBIT received

customer payments using its cryptocurrency wallets, including the wallet address ending in P1Awf (the "GOTBIT Wallet").

2. Defendant Antoine TSAO, a/k/a Chung Tien Tsao ("TSAO"), lived in Taiwan and worked as a Business Development Manager at GOTBIT.

3. Defendant Ian SOFRONOV ("SOFRONOV") lived in Russia and worked as a Sales Manager at GOTBIT.

4. Defendant Nemanja POPOV ("POPOV") lived in Serbia and worked as a Global Account Manager at GOTBIT.

5. Co-conspirator 1 ("CC-1") lived in Russia and Portugal and was the founder and Chief Executive Officer at GOTBIT.

6. Co-conspirator 2 ("CC-2"), co-conspirator 3 ("CC-3"), and co-conspirator 4 ("CC-4") were individuals who worked at GOTBIT.

7. The Lexobit Token ("Lexobit") was a cryptocurrency token created at the direction of law enforcement. Lexobit operated on the Ethereum blockchain.

8. Beginning at a date unknown to the Grand Jury but no later than in or around January 2018 and continuing through a date unknown to the Grand Jury, but to at least on or about August 20, 2024, defendants TSAO, SOFRONOV, POPOV, CC-1, CC-2, and CC-3, and others known and unknown to the Grand Jury, conspired to manipulate the trading volume and price of one or more cryptocurrencies, including Lexobit, in order to profit through payments from cryptocurrency companies and from the sale of those cryptocurrencies at inflated prices.

## Key Terms

9. Virtual currency was a digital asset or digital representation of value that can be electronically traded and exchanged online. Virtual currency was not backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset. Similar to many fiat currencies, many virtual currencies have had a market-based value that goes up or down based on various factors.

10. Cryptocurrency was a subset of virtual currency that utilizes blockchain technology. A blockchain was a distributed ledger, recorded on a decentralized network, containing an immutable and historical record of transactions made with the cryptocurrency. Each cryptocurrency had its own coding

(or "smart contract") that governs how it operated.

11. Ethereum was a well-known blockchain that could be used to create different cryptocurrencies. Ether ("ETH") was the primary Ethereum-based cryptocurrency. Many other Ethereum-based cryptocurrencies utilized the Ethereum blockchain, which were referred to in the cryptocurrency community as "tokens."

12. Cryptocurrency could be stored in a cryptocurrency "wallet" located, for example, in an electronic storage device, in a cloud-based server, or on a cryptocurrency exchange. Cryptocurrency transactions could be made between wallets.

13. Cryptocurrency "exchanges" were digital marketplaces where individuals could purchase or trade cryptocurrencies. Depending on the exchange's level of control over its listings and trading, exchanges were typically referred to either as "decentralized" (commonly abbreviated as "DEX") or "centralized" (commonly abbreviated as "CEX"). During the relevant period, Uniswap operated as a decentralized cryptocurrency exchange that was available to the public, including to individuals in the United States.

14. A "market maker" in the cryptocurrency industry was a company that offered services to cryptocurrency companies. Legitimate market-making services included, for example, the active monitoring of cryptocurrency trading and price fluctuations, trading in a company's cryptocurrency to capitalize on price fluctuations, and related consulting services.

15. "Wash trading" occurred when a single trader or a number of traders, working in coordination, acted as both the buyer and the seller in the same transaction or a series of transactions, such that there was no change in beneficial ownership. These transactions served no legitimate economic purpose and were designed solely to generate misleading market information and created the false impression of market interest to induce other investors to buy or sell the asset.

<u>The Conspiracy and Scheme to Defraud</u>

As part of the conspiracy and scheme to defraud:

16. In or around 2018, CC-1 founded GOTBIT, a cryptocurrency market maker. In or around April 2021, GOTBIT's registration documents listed CC-1 as its sole owner. According to GOTBIT's website, by 2021, GOTBIT had more than "100 team members."

INDICTMENT 3

17. In reality, GOTBIT and its employees perpetrated a widespread cryptocurrency market manipulation scheme wherein cryptocurrency companies ("GOTBIT Customers") paid GOTBIT approximately $5,000 per month to artificially inflate the trading volume of the GOTBIT Customers' tokens through wash trading. This trading tactic created the appearance that the GOTBIT Customers' cryptocurrencies had more active, organic trading markets than really existed, thereby inducing investors to purchase those cryptocurrencies and increasing the trading price of those cryptocurrencies. GOTBIT and the GOTBIT Customers then profited through the sale of those cryptocurrencies at the artificially inflated trading prices that they themselves created. CC-1 outlined GOTBIT's role in fraudulent schemes during media interviews in 2019, stating:

   a. "Our product now is providing the full control over the token's market: the volume, the price, the liquidity, and making money on the price movements[.]"

   b. "We would create a buy order from one account, a sell order from another account, they would meet inside of the spread where there were no other orders . . . [.]"

   c. CC-1 was also asked whether cryptocurrency exchanges can trace whether GOTBIT's accounts were "trading with themselves?" CC-1 replied, "[W]e have a solution for this. The current version of our software supports up to 20 accounts for the cross-platform trading. Let's say there are 20 accounts on an exchange all connected to our bot; we'll have to do a bit of magic with IP addresses but . . . everything will look as if those 20 accounts are trading between each other and it's very hard to track what is going on in reality."

   d. CC-1 also stated, "I think that it's the investors and those who believe in the crypto industry who are losing here."

<u>Wash Trading of the Lexobit Token</u>

18. On or about February 28, 2024, law enforcement Undercover Employees (the "UCEs") approached TSAO at a cryptocurrency conference. During their initial encounter, the UCEs expressed interest to TSAO in retaining GOTBIT's market-making services for Lexobit.

19. On or about February 29, 2024, the UCEs met with TSAO to further discuss GOTBIT's

services. During the meeting, TSAO explained how GOTBIT could provide services for the UCEs' token project, stating, in pertinent part:

    a. "So, I think the main difference between crypto and other industries is crypto is a lot less regulated. The stuff that we do can't really be done in traditional markets . . . ."

    b. "We also do a lot of liquidations for projects. There are like meme projects that just pump their price up and then they just start dumping the shit out of it. Just dump everything and just move on to the next one. We take like 2% from liquidations. So, we are also very transparent about it. We don't judge."

    c. "It all depends on what you guys want. For, like, in depth conversations, we can just bring the whole team in and see how we can structure up the strategy. If it's a pump and dump, then [let the team know] how we're supposed to do it."

20. On or about April 10, 2024, after the UCEs had expressed interest in moving forward with a business arrangement with GOTBIT, TSAO created a private chatroom on Telegram, an encrypted cloud-based messaging service. TSAO invited the UCEs and two GOTBIT employees, one of whom was SOFRONOV, into the chatroom and named it "Lexobit <> GotBit" (the "Telegram chat"). TSAO and SOFRONOV then scheduled a video conference with the UCEs.

21. On or about May 9, 2024, the UCEs had a video conference with TSAO and SOFRONOV in which they discussed the terms and conditions of a formal business arrangement between GOTBIT and the UCEs' token project. During the call, SOFRONOV explained that at GOTBIT "we have discussions [with you] everyday - about . . . what volumes we should apply . . . like a personal trading team." TSAO added, "You know what you want to see in the charts. . . . You tell us what to do and we execute it."

22. After the video conference, SOFRONOV sent a document to the Telegram chat entitled, "Proposal for Lexobit.pptx.pdf." The document stated, among other things, that, "Lexobit is looking for the proper Marketmaking, creating a decent market, attract traders to the market and future market involvement [*sic*]. Gotbit is ready to help with this and show better performance on the markets. With you will work a team of 6 professional traders, who will control your market all day long . . . ." The

INDICTMENT 5

proposal stated that GOTBIT does "High-frequency trading" and has a "Dynamic volume system" where it does "volume management during the day."

23. On or about May 21, 2024, the UCEs informed SOFRONOV and TSAO that they were prepared to agree to GOTBIT's proposal and inquired about next steps.

24. On or about May 22, 2024, SOFRONOV responded to the UCEs via the Telegram chat. SOFRONOV replied, in pertinent part, "I prepare the legal contract and send it to you. Firstly, we signed a legal document. There you will find all the terms and conditions[.]" SOFRONOV further stated that he would "allocate a team" for Lexobit and they need to "finalize the MM [Market Making] inventory process (like funds that we trade with) and start working!"

25. On or about May 22, 2024, a UCE executed a "Market Maker Agreement" with GOTBIT pursuant to which GOTBIT agreed to provide market-making services in support of the UCEs' token project. Section 1.2 of the Market Maker Agreement listed the services provided by GOTBIT, which included a "trading volume system." Section 3.1.2 of the Market Maker Agreement stated that GOTBIT was entitled to "2% of the token liquidation generated" by GOTBIT. Section 3.1.3 of the Market Maker Agreement stated that GOTBIT was entitled to "20% of the net profit generated" by GOTBIT.

26. On or about May 22, 2024, the Market Maker Agreement was digitally signed by CC-1.

27. On or about May 22, 2024, SOFRONOV sent an invoice to the UCEs via a link he posted within the Telegram chat. Shortly thereafter, to consummate the market-making agreement with GOTBIT, and to retain its services for a three-month period, one of the UCEs made a payment of $15,000 to the GOTBIT wallet. SOFRONOV sent a message to the Telegram chat confirming GOTBIT's receipt of the payment.

28. On or about May 22, 2024, CC-4 added several additional GOTBIT employees to the Telegram chat, including POPOV, CC-2, and CC-3. CC-4 introduced POPOV as a "personal account manager," and CC-2 and CC-3 were described as personal traders.

29. On or about June 10, 2024, the UCEs conducted a virtual teleconference via Google Meet with POPOV and CC-3. During the meeting, POPOV stated, in pertinent part:

        a. "Regarding those things that you might need, for example, 'I would like to see volume push in the next nine hours.' Completely fine. You can just type it in the chat. Tag me or anybody from the trading team and we are going to be ready to execute as you wish on the markets with the bots."

        b. "Regarding the percentages, we can always tell you, regarding when the spike happens, which part was organic, which part wasn't . . . ."

        c. "We are going to have the order book, which you can always look on to see which sell and which buy is open, and you're going to know and differentiate which one is ours and which one is not."

30. On or about August 9, 2024, CC-3 sent a message to the Telegram chat, stating, "To start the work, [and] possible push and work on volumes, we will need 5 ETH + 4% of the supply token. An important point that I would like to note is that we will be able to deploy the bot only if we have funds. And after the deployment, we will send a list of all wallets to the chat."

31. On or about August 14, 2024, in response to CC-3's request, one of the UCEs sent 5 ETH (valued at approximately $17,605 at the time of the transaction) to the GOTBIT Wallet.

32. On or about August 19, 2024, CC-2 sent one of the UCEs a list of 36 cryptocurrency wallet addresses (collectively, the "GOTBIT Trading Wallets") that GOTBIT would use to trade Lexobit and informed the UCEs that the "bots are deployed and ready for launch."

33. On or about August 19, 2024, traders from GOTBIT engaged in wash trading of Lexobit on the Uniswap cryptocurrency exchange until later that day when law enforcement suspended trading activity.

34. On or about August 20, 2024, one of the UCEs conducted a video call with POPOV in which POPOV said to the UCE that "100%" of the trading volumes for Lexobit were "inorganic" and driven by GOTBIT surreptitiously trading with its own cryptocurrency wallets.

35. Law enforcement analysis of the blockchain data associated with the trading of Lexobit corroborated POPOV's statement and revealed that substantially all of the activity generated during the launch of Lexobit was the result of GOTBIT's wash trading activities. Specifically, the analysis

INDICTMENT 7

revealed that there was a total of 1,221 buy and sell transactions of Lexobit. Of this total, GOTBIT Trading Wallets conducted 1,209 (or 99%) of the buy and sell transactions.

36. TSAO, SOFRONOV, POPOV, CC-1, CC-2, and CC-3 used means and instrumentalities of interstate commerce in connection with the above actions in the scheme to defraud, including email and messaging communications, electronic funds transfers, and cryptocurrency transfers.

COUNT ONE: (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

37. Paragraphs 1 through 36 of this Indictment are re-alleged and incorporated as if fully set forth here.

38. Beginning at a date unknown to the Grand Jury but no later than in or around January 2018, and continuing through a date unknown to the Grand Jury, but to at least on or about August 20, 2024, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendants,

ANTOINE TSAO,
IAN SOFRONOV, and
NEMANJA POPOV,

and others, known and unknown, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and concealment of material facts, and, for the purpose of executing such scheme or artifice and attempting to do so, transmit, and caused to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO AND THREE: (18 U.S.C. § 1343 – Wire Fraud)

39. Paragraphs 1 through 36 of this Indictment are re-alleged and incorporated as if fully set forth here.

40. Beginning at a date unknown to the Grand Jury but no later than in or around January 2018, and continuing through a date unknown to the Grand Jury, but to at least on or about August 20,

INDICTMENT 8

2024, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendants,

ANTOINE TSAO,
IAN SOFRONOV, and
NEMANJA POPOV,

together with others known and unknown, did knowingly and with the intent to defraud participate in, devise, and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of concealment of material facts.

The Use of the Wires

41.     On or about the dates set forth in the separate counts below, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendants,

ANTOINE TSAO,
IAN SOFRONOV, and
NEMANJA POPOV,

did transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically:

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| TWO | May 9, 2024 | Videoconference between TSAO and SOFRONOV, two GOTBIT employees located outside the Northern District of California, and two UCEs, both of whom were located within the Northern District of California, to discuss artificially inflating the trading volume of the Lexobit Token through manipulative trading. |
| THREE | June 10, 2024 | Videoconference between POPOV, a GOTBIT employee located outside the Northern District of California, and two UCEs, one of whom was located within the Northern District of California, to discuss artificially inflating the trading volume of the Lexobit Token through manipulative trading. |

All in violation of Title 18, United States Code, Section 1343.

FORFEITURE ALLEGATION:     (18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c))

42.     The allegations contained in this Indictment are re-alleged and incorporated by reference

INDICTMENT                                            9

for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1) and Title 28, United States Code, Section 2461(c).

43. Upon conviction for any of the offenses set forth in Count One through Count Three of this Indictment, the defendants,

> ANTOINE TSAO,
> IAN SOFRONOV, and
> NEMANJA POPOV,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations, as the result of those violations, including but not limited to:

    a. the wallet address ending in P1Awf (the "GOTBIT Wallet") used by GOTBIT employees to receive payment for market manipulation services.

If any of the property described above, as a result of any act or omission of the defendants:

    a. cannot be located upon exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

//
//
//
//
//

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED: March 25, 2025

A TRUE BILL.

/s/ Foreperson of the grand jury
FOREPERSON

PATRICK D. ROBBINS
Acting United States Attorney

/s/ Benjamin Kleinman
BENJAMIN K. KLEINMAN
Assistant United States Attorney

INDICTMENT	11